

**NUMBER 13-12-00504-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**JOHN JAMES HARKINS, ET AL.,**                                    **Appellants,**

**v.**

**NORTH SHORE ENERGY, L.L.C.,**                                    **Appellee.**

---

**On appeal from the 267th District Court
of Goliad County, Texas.**

---

# MEMORANDUM OPINION

**Before Justices Rodriguez, Garza and Perkes
Memorandum Opinion by Justice Garza**

This sprawling oil and gas dispute involves a well drilled by appellee, North Shore Energy ("North Shore"), on certain Goliad County land owned by appellant John James Harkins.[1]  Harkins argues by three issues that the trial court erred by concluding

---

[1] Harkins co-owns the executive rights to the minerals under the land at issue.  Dolores Marie

that the well did not trespass on his property and by granting summary judgment to North Shore on that basis. Appellant Dynamic Production, Inc. ("Dynamic") asserts by thirteen issues[2] that the trial court erred by rendering partial summary judgment in favor of North Shore and by rendering judgment against Dynamic after trial on the issue of tortious interference with contract. We affirm as modified.

## I. BACKGROUND

### A. The Option Agreement

On June 3, 2009, Harkins and North Shore entered into an agreement (the "Option Agreement") giving North Shore the exclusive right to acquire one or more oil and gas leases on a portion of Harkins' property. In exchange for the option, North Shore paid $140,000, representing $50 per acre, as consideration. The Option Agreement provided, in relevant part:

> [Harkins] hereby grants to [North Shore] the exclusive right on and under the following described lands, situated in Goliad County, Texas, to-wit:
>
> > All that certain property more fully described on EXHIBIT "A" attached hereto and made a part hereof for all purposes.
>
> (hereinafter called "Said Land"), the exclusive option to acquire oil and gas leases on all or a portion of Said Land under the terms and provisions of that certain Oil and Gas Lease form set forth on Exhibit "B" attached hereto and made a part hereof for all intents and purposes, subject to the following terms and conditions:
>
> 1.     For a period of twenty-four (24) months from the date hereof

Harkins, Janey Frances Harkins Hiller, Allen Anthony Harkins, Patricia Ailene Harkins, Wilson William Harkins IV, and Heath Alan Harkins are co-owners of the mineral rights, were named as parties in the trial court, and are named as appellants here. We will refer to these appellants collectively as "Harkins."

[2] The "Issues Presented" section of Dynamic's brief contains thirteen numbered items, eleven of which individually exceed 100 words in length. *See* TEX. R. APP. P. 38.1(f) (requiring that the "Issues Presented" section "state concisely all issues or points presented for review"). The "Argument" section of the brief contains nine sections and nine subsections which do not correspond to the issues listed in the "Issues Presented" section. Because briefing rules are to be construed liberally, *see* TEX. R. APP. P. 38.9, we accept the brief and endeavor to address all issues fairly raised.

(hereinafter called the "Option Term"), [North Shore] shall have the exclusive option on Said Land.

2.    At any time and from time to time during the Option Term, [North Shore] has the right to exercise its exclusive option to acquire an Oil and Gas Lease covering all or a portion (as hereinafter provided) of Said Land pursuant to the terms and provisions set forth on the Oil and Gas Lease form attached as Exhibit "B", (hereinafter called the "Oil and Gas Lease") by tendering a check payable to [Harkins] in an amount equal to Two Hundred Dollars ($200.00) per net mineral acre for each net acre owned by [Harkins] selected by [North Shore] out of Said Land, on which such option and/or options are exercised by [North Shore]. . . .

. . . .

7.    At such time as [North Shore] elects to exercise its option to acquire an Oil and Gas lease on Said Land pursuant to this Agreement, then such option as to such selected acreage shall expire and said Oil and Gas Lease shall become effective. . . .

. . . .

14.   This Option to Purchase Oil and Gas Lease is expressly made subject to the Oil, Gas, and Mineral Lease covering part of Said Land, and [North Shore] will be responsible for obtaining any consent from the Lessee that may be required. [North Shore]'s right to exercise its option to take an Oil and Gas Lease is also subject to the existing Lease on part of Said Land.

Exhibit "A" to the Option Agreement described two tracts of land, "Tract 1" and

"Tract 2." Pertinent to this case, "Tract 2" was described as follows:

Being 1,210.8224 acres of land, more or less, out of the 1673.69 acres out of the Caleb Bennett Survey, A-5, Goliad County, Texas and being the same land described in that certain Memorandum of Oil and Gas Lease dated March 14, 1996 from The Estate of Janie Frances Harkins, Deceased, to Export Petroleum Corporation and being recorded in Volume 50 at Page 454 of the Official Public Records of Goliad County, Texas to which deed reference is here made for a more complete description of said land.

The March 14, 1996 Memorandum of Oil and Gas Lease referenced above (the "Export

Lease") described the land to which it applied as follows:

3

> Being 1273.54 acres situated in Goliad County, Texas, and being all of the 1673.69 acre tract described on EXHIBIT "A" attached hereto, SAVE AND EXCEPT a 400.15 acre tract described in a Memorandum of Oil and Gas Lease between the Estate of Janie Frances Harkins, deceased, and Hamm[a]n Oil & Refining, dated March 13, 1995, recorded in Volume ___, Page ___[3], of the Public Records of Goliad County, Texas.

The March 13, 1995 Memorandum of Oil and Gas Lease (the "Hamman Lease"), in turn, contained a metes and bounds description of the 400.15-acre tract referenced in the Export Lease. Exhibit "A" to the Export Lease states:

> Field notes of a 1673.69 acre tract, being a part of a tract of land conveyed from Cyrus B. Lucas, et al., to John J. O'Brien by Deed dated February 7, 1931, and recorded in Volume 66, Page 325 of the Deed Records of Goliad County, Texas;

> Said 1673.69 acre tract is comprised of a portion of the Solon Bartlett Survey, Abstract 4 and the Caleb Bennett Survey, Abstract 5, is situated in Goliad County, Texas, approximately 4 miles north of the town of Blanconia and is described by metes and bounds as follows:

> Beginning at a point in the center of Sarco Creek . . .

> [most of lengthy description omitted]

> . . . .

> Thence S 82° 09ˈ W a distance of 8663.39 feet to the place of beginning, containing 1673.69 acres, more or less. Save and Except a 400.15 tract described in Participation Agreement dated November 8, 1995, between Hamman Oil and Refining Company and Alia Mesa Resources, Inc., et al., recorded in the Deed Records of Goliad County, Texas.[4]

## B.     North Shore's Attempt to Secure Leases

In September 2009, North Shore paid Harkins nearly $33,000 with the objective of securing a lease on a 169.9-acre area enclosed entirely within "Tract 2" as defined in

---

[3] As in original.

[4] This "Participation Agreement" does not appear in the record.

Exhibit "A" to the Option Agreement.[5] A formal lease agreement was never executed.[6] Nevertheless, North Shore proceeded to drill a well on the 169.9-acre tract that it identified. In December 2009, North Shore and Harkins executed an easement so that the well could be connected to a gas purchaser's pipeline. According to an affidavit by Catherine Schaper, one of North Shore's co-owners, North Shore paid Harkins and other surface rights owners over $17,000 for the easement, and the easement instrument contained a detailed survey plat showing the location of the well in relation to local boundaries and landmarks. Schaper further averred that North Shore spent over $700,000 to drill and complete the well. The well commenced production in January 2010.

Harkins knew that North Shore had built a well and initially assumed that it was situated on land covered by the Option Agreement. However, in March 2010, Harkins, relying on the advice of landman Bill Bishop, came to believe that the well had in fact been drilled on land that was excluded from the Option Agreement. In particular, Harkins believed that the well was actually situated on the 400.15-acre tract which was described in the Hamman Lease and referenced in the Export Lease. According to Harkins, this 400.15-acre tract was specifically excluded from the description of land in the Option Agreement. Harkins therefore believed that the well constituted a trespass on his property. Harkins' attorneys informed North Shore of the problem and offered North Shore the opportunity to negotiate a valid lease of the land upon which the well was already situated. Those negotiations failed.

---

[5] North Shore also paid Harkins in an attempt to obtain a lease on a 570.941-acre area enclosed entirely within "Tract 1" as defined in Exhibit "A" to the Option Agreement.

[6] North Shore viewed the execution of a lease instrument as a formality because the Option Agreement provides that North Shore may exercise its option merely by making payment.

5

## C.    Dynamic's Involvement

Meanwhile, Dynamic had expressed its interest in conducting seismic exploration activities on much of Harkins' land, including on the tract purportedly leased by North Shore.    Initially, Dynamic approached North Shore about obtaining permission to conduct those activities; however, after negotiations with North Shore failed in February 2010, Dynamic took the position that the right to approve seismic exploration actually belonged to Harkins.    Dynamic then proceeded to negotiate directly with Harkins about acquiring seismic exploration rights.    On March 19, 2010, Dynamic sent to Harkins a "Letter of Intent to Acquire Oil and Gas Lease" (the "Letter of Intent") on the 400.15-acre tract identified in Exhibit "A" to the Hamman Lease.[7]    Subsequently, in April of 2010, Dynamic and Harkins executed an agreement (the "Seismic Permit") granting Dynamic the right to conduct seismic exploration on various tracts of land, including:

> 1673.69 acres of land, more or less, situated in the Caleb Bennett Survey, A-5, Goliad County, Texas, being more fully described by metes and bounds in Exhibit "A" to that certain Memorandum of Oil and Gas Lease dated March 14, 1996 from the Estate of Janie Frances Harkins to Export Petroleum Corporation, recorded in Volume 50, Page 454, Official Public Records, Goliad County, Texas.

On June 17, 2010, Harkins and Dynamic entered into an oil and gas lease agreement (the "Dynamic Lease") based upon the Letter of Intent sent by Dynamic in March.    The Dynamic Lease was largely based on the form lease agreement attached as Exhibit "B" to North Shore's Option Agreement.    However, it contained additional provisions stating that:    (1) Harkins would assign all of his causes of action against North Shore to Dynamic, (2) Dynamic would indemnify Harkins for any liability incurred

---

[7] The Letter of Intent stated that Dynamic proposed to pay Harkins $400 per net mineral acre for an oil and gas lease "covering 160 acres of land in the form of a square around the wellbore of the [North Shore] Well" and $250 per net mineral acre for a lease "covering 240.15 acres, being the balance of the 400.15 acres subject to this letter of intent."

6

by Harkins (including "attorney's fees, expert's fees and court costs") "arising out of or by virtue of [the Option Agreement], the assignment of claims herein made or the granting of [the Dynamic Lease]"; and (3) Harkins would agree to participate in any litigation between Dynamic and North Shore.

## D.    Litigation Begins

North Shore then filed the instant lawsuit against both Dynamic and Harkins.  In its original petition filed in August 2010, North Shore contended that "[t]he Option Agreement as written does not reflect the true agreement of the parties" due to a "scrivener's error."   North Shore asserted that the parties intended for the Option Agreement to cover the land upon which the well was drilled, and it requested that the agreement be reformed to explicitly include that land.   North Shore's petition also included a suit to quiet title with regard to the land surrounding the well.

In subsequent amended petitions, North Shore contended that the Option Agreement included the disputed 400.15-acre tract and was not drafted erroneously.[8] North Shore further claimed that Harkins repudiated the Option Agreement and that Dynamic tortiously interfered with the Option Agreement and committed "conscious and malicious geophysical trespass" by conducting seismic exploration on the allegedly leased land.   North Shore further made an alternative claim for "recovery under assumpsit in lieu of geophysical trespass for the reasonable value of the use and occupation of the land and appropriation of trade secrets . . . ."  In its amended petitions, North Shore requested actual and exemplary damages from Dynamic as well as an

---

[8] North Shore's amended petitions retained the reformation claim, but asked for reformation only in the alternative to the trespass claim and only "if any material defects in the Option Agreement appear." The amended petitions also retained the pleadings to quiet title.

7

order compelling Harkins to specifically perform the Option Agreement by executing oil and gas leases on the tracts identified by North Shore in September 2009. Harkins and Dynamic asserted counterclaims of trespass, tortious interference with contract, and conversion, and sought damages, declaratory relief, attorney's fees, an accounting, and the appointment of a receiver to take over operation of the subject well.

## E. Summary Judgment Motions

The parties each moved for summary judgment. In its summary judgment motion, North Shore contended that the Option Agreement unambiguously included the 400.15-acre Hamman Lease tract and that, because North Shore complied with the agreement's provisions regarding invocation of the option, Harkins should be compelled to specifically perform his obligations under the agreement. North Shore noted that, until Dynamic became involved in the case, no party believed that the 400.15-acre Hamman Lease tract was excluded. As evidence, North Shore presented a map produced by Dynamic in discovery which purported to identify the land optioned to North Shore under the Option Agreement; the map demarcates the boundaries of the 400.15-acre Hamman Lease tract but does not appear to indicate that the tract was excluded from the land made available for lease in the Option Agreement.[9] North Shore argued that the Hamman Lease had expired before the parties executed the Option Agreement and that "[t]he parties did not intend to pointlessly exclude a large square of useful acreage in the middle of an optioned tract . . . ." North Shore further argued that the

---

[9] The map produced by Dynamic in discovery depicts the irregularly-shaped "Tract 2" identified in the Option Agreement as shaded. The 400.15-acre Hamman Lease tract, which is roughly square-shaped and lies entirely within "Tract 2," is demarcated by a dashed line on the map, but the interior of the 400.15-acre tract is shaded in the same manner as the remainder of "Tract 2."

Dynamic also produced another map in discovery that was apparently produced some time later and explicitly excluded the 400.15-acre area from "Tract 2."

Option Agreement gave it the "exclusive right to explore for oil and gas" on the optioned area.  In support of the motion, North Shore attached affidavits by its principals Schaper and W. Troy West, as well as its attorney J. Robert Goldsmith, averring to the facts set forth in North Shore's petition and summary judgment motion.

North Shore also attached as summary judgment evidence certified copies of Texas Railroad Commission records indicating that a well which had been drilled by Hamman Oil & Refining Company pursuant to the Hamman Lease was plugged on March 22, 2006.

The motion for summary judgment filed by Harkins and Dynamic asserted both traditional and no-evidence grounds.  First, the defendants' motion alleged that North Shore had produced no evidence that Harkins repudiated the Option Agreement.  Second, Harkins and Dynamic argued that North Shore had produced no evidence that it had exclusive exploration rights regarding the land at issue and, therefore, North Shore's trespass, conversion, and conspiracy claims must fail.  Third, the defendants asserted that North Shore had not established an assumpsit cause of action.  Fourth, Harkins and Dynamic argued that North Shore was not entitled to reformation of the Option Agreement because there was no unilateral or mutual mistake as to its terms; instead, Harkins and Dynamic alleged that the Option Agreement unequivocally excludes the 400.15-acre Hamman Lease tract from its property description.  Finally, the defendants' summary judgment motion stated that North Shore produced no evidence establishing its entitlement to exemplary damages or attorney's fees.

Harkins and Dynamic also filed an objection to North Shore's summary judgment evidence, contending that various parts of the three affidavits were unreliable and

9

inadmissible.

On September 9, 2011, the trial court: (1) denied the motion for summary judgment filed by Harkins and Dynamic in its entirety; (2) overruled Harkins's and Dynamic's objections to North Shore's affidavits; and (3) granted partial summary judgment to North Shore in a series of four separate orders. The four orders granting relief to North Shore stated respectively and in relevant part as follows:

> The Court finds as a matter of law that under the provisions of the [Option Agreement] . . . [Dynamic], which is not a party to the Option Agreement, does not have the right to conduct exploratory operations on either Tract 1 or Tract 2 as described in the Option Agreement during the term of the Option Agreement.
>
>      . . . .
>
> It is hereby ORDERED that the Oil and Gas lease from [Harkins], as Lessors, to [Dynamic], as Lessee, covering 400.15 acres in the Caleb Bennett Survey, dated June 17, 2010 . . . is removed as a cloud on the rights, titles, and interests held by [North Shore] under [the Option Agreement], and the Oil and Gas Leases covering 169.9 acres which have this day been ordered by this Court to be executed and delivered.
>
>      . . . .
>
> It is therefore ORDERED that within 15 days of the date of this Order, [Harkins] shall execute and return the respective Oil and Gas Lease counterparts to [North Shore] as lessee, covering 570.941 acres out of Tract 1 as described in the [Option Agreement] that are currently in the possession of [Harkins].
>
>      . . . .
>
> It is therefore ORDERED that [Harkins] shall execute and return the form Oil & Gas Lease to [North Shore] as lessee which is attached as Exhibit B to the [Option Agreement], covering 169.9 acres out of the Caleb Bennett Survey A-5, Goliad County, Texas, within 15 days from the date the leases are delivered to Defendants' counsel.

## F.     Trial and Judgment

The cause proceeded to trial in July of 2012 on North Shore's tortious

interference and assumpsit claims.[10]  After trial, the jury found that Dynamic intentionally interfered with the Option Agreement and caused North Shore to suffer $574,000 in actual damages.  The jury also found by clear and convincing evidence that North Shore's damages resulted from malice on the part of Dynamic, and it assessed $1.7 million in exemplary damages.  Finally, with respect to North Shore's assumpsit claim, the jury concluded that North Shore was entitled to $88,800 representing the "reasonable market value of the seismic testing at the time and place it occurred" and $46,250 representing the "reasonable market value of the processed seismic data." The trial court denied the defendants' motions for new trial and to modify the judgment and rendered judgment on May 18, 2012:  (1) ordering Dynamic to pay North Shore actual damages of $709,050 and exemplary damages of $1,148,000, plus postjudgment interest on those amounts; (2) awarding North Shore trial attorney's fees of $405,338[11] "in connection with its suit on a written contract against [Harkins]," plus postjudgment interest, payable by Harkins; and (3) incorporating the previously-rendered summary judgment orders.  The trial court rendered findings of fact and conclusions of law chiefly related to North Shore's recovery of attorney's fees.  This appeal followed.

## II. DISCUSSION

### A.    Summary Judgment

Harkins's first two issues and Dynamic's first, second, and seventh issues argue that the trial court erred in its September 9, 2011 summary judgment rulings.

---

[10] The trial court denied a motion filed by Harkins and Dynamic to sever the claims that had been determined by the summary judgment orders.

[11] The final judgment also awarded conditional appellate attorney's fees of $73,750 in the event an unsuccessful appeal is made to this Court, and $33,750 in the event an unsuccessful appeal is filed with the Texas Supreme Court.

### 1.    Standard of Review

A motion for summary judgment may be brought on no-evidence or traditional grounds.  *See* TEX. R. CIV. P. 166a(c), (i).  A motion for no-evidence summary judgment is equivalent to a motion for pretrial directed verdict, and we apply the same legal sufficiency standard on review.  *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 772 (Tex. App.—Corpus Christi 2003, no pet.) (op. on reh'g).  Such a motion should be granted if there is no evidence of at least one essential element of the claimant's cause of action.  *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (per curiam).  The burden of producing evidence is entirely on the non-movant; the movant has no burden to attach any evidence to the motion, and if the non-movant produces evidence raising a genuine issue of material fact, summary judgment is improper.  TEX. R. CIV. P. 166a(i).  All that is required of the non-movant is to produce a scintilla of probative evidence to raise a genuine issue of material fact on the challenged element.  *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003); *Ortega*, 97 S.W.3d at 772.  "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion of a fact.'"  *Ortega*, 97 S.W.3d at 772 (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)); *see Forbes*, 124 S.W.3d at 172. Conversely, more than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions.  *Forbes*, 124 S.W.3d at 172; *Ortega*, 97 S.W.3d at 772 (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994)).  In determining whether the non-movant has produced more than a scintilla of evidence, we review the evidence in the light most favorable to the non-movant, crediting such

evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Tamez*, 206 S.W.3d at 582; *City of Keller v. Wilson*, 168 S.W.3d 802, 825, 827 (Tex. 2005).

We review the trial court's granting of a traditional motion for summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003); *Branton v. Wood*, 100 S.W.3d 645, 646 (Tex. App.—Corpus Christi 2003, no pet.). A motion for traditional summary judgment must show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). The movant bears the burden of proof, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *See Sw. Elec. Power Co.*, 73 S.W.3d at 215. We take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

When both parties move for summary judgment and the trial court grants one motion and denies the other, we review both parties' summary judgment evidence and determine all questions presented. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000); *Warrantech Corp. v. Steadfast Ins. Co.*, 210 S.W.3d 760, 765 (Tex. App.—Fort Worth 2006, no pet.). Our task is to render the judgment that the trial court should have rendered. *See FM Props.*, 22 S.W.3d at 872; *Warrantech*, 210 S.W.3d at 765. We will affirm a summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex. 2004).

13

## 2. Applicable Law

When a written contract is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous, and the court construes it as a matter of law. *Am. Mftrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). On the other hand, a contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). This determination is made in light of the circumstances present when the parties entered into the contract. *Ganske v. Spence*, 129 S.W.3d 701, 707 (Tex. App.—Waco 2004, no pet.) (citing *Grimes v. Andrews*, 997 S.W.2d 877, 881 (Tex. App.—Waco 1999, no pet.)). An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). For an ambiguity to exist, both interpretations must be reasonable. *Id.*

Extrinsic evidence of intent is admissible only if the contract is ambiguous on its face. *See Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996); *CenterPoint Energy Houston Elec., L.L.P. v. Old TJC Co.*, 177 S.W.3d 425, 431 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("A court may consider the parties' interpretations of the contract through extrinsic or parol evidence only after a contract is first determined to be ambiguous."). A mere disagreement about the proper interpretation of a contract, however, does not make the contract ambiguous; the instrument is ambiguous only if, after application of the rules of construction, the contract is reasonably susceptible to more than one meaning. *Brown v. Havard*, 593

14

S.W.2d 939, 942 (Tex. 1980); *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951).

### 3. Interpretation of Property Description

Harkins's argues by his first issue that the trial court erred in granting summary judgment to North Shore on the issue of whether North Shore's well was drilled on land covered by the Option Agreement.[12] This is the central issue in this appeal and it turns on the interpretation of the description of land in the Option Agreement and the references contained therein.

We find that the description of land in the Option Agreement is capable of more than one reasonable interpretation. The description of "Tract 2," where North Shore drilled its well, is as follows: "Being 1,210.8224 acres of land, more or less, out of the 1673.69 acres out of the Caleb Bennett Survey, A-5, Goliad County, Texas and being the same land described in [the Export Lease]." This description can have two different reasonable meanings depending on what the phrase "and being the same land described in [the Export Lease]" is understood to modify. One reasonable interpretation would be that this phrase modifies "1,210.8224 acres of land, more or less." That interpretation would be reasonable because the reference to "1,210.8224 acres" and the reference to "the same land described in [the Export Lease]" are both preceded by the word "[b]eing," indicating that "1,210.8224 acres" refers to the same land as that to which the Export Lease applies. Moreover, the total amount of land to which the Export

---

[12] The trial court concluded that the well was, in fact, drilled on optioned land. This finding supported the trial court's orders (1) removing the Dynamic Lease as a cloud on North Shore's title, and (2) compelling Harkins to deliver leases to North Shore per the Option Agreement.

15

Lease applies is 1,273.54 acres,[13] which may be considered "more or less" equivalent to "1,210.8824 acres." *See Slagle v. Clark*, 237 S.W.2d 430, 433 (Tex. Civ. App.— Amarillo 1951, no writ) (noting that the presence of the words "more or less" in a deed "indicates a sale in gross, and not by acre" and constitutes "prima facie evidence that the parties intended to risk a not unreasonable gain or loss in the estimated quantity"). This interpretation, favored by Harkins and Dynamic, would mean that "Tract 2" is identical to the land to which the Export Lease was applicable—i.e., it would exclude the land upon which North Shore drilled its well.

North Shore argues that this interpretation is unreasonable because, "when one document refers to another for *descriptive* purposes, only the parts of the referenced document that can be harmonized with the information in the main document are looked to and the rest of the referenced document is to be ignored." (Emphasis in original.) North Shore cites *American Savings & Loan Ass'n of Houston v. Musick*, 531 S.W.2d 581, 585 (Tex. 1975), and *Sharp v. Fowler*, 252 S.W.2d 153, 154 (Tex. 1952), for that proposition, and it argues that "[t]he only part of the Export [Lease] that can be harmonized with information in the Option Agreement is the surveyor's field notes on its Exhibit A describing the boundaries of a 1673.69 acre tract—exactly the size referred to in the Option Agreement in its description of Tract 2." We note that the *Musick* and *Sharp* cases do not explicitly support the tenet of law set forth by North Shore. In any event, we do not find this argument persuasive. As noted above, the Export Lease described a 1,273.54-acre tract consisting of 1,673.69 acres minus the 400.15-acre Hamman Lease tract. This description can be harmonized with the Lease Agreement's

---

[13] 1,673.69 acres minus the 400.15-acre Hamman Lease tract.

16

description of "1,210.8224 acres of land, more or less, out of the 1673.69 acres . . . ." *See Slagle*, 237 S.W.2d at 433.

A second reasonable interpretation of the Lease Agreement's property description would hold that "and being the same land described in [the Export Lease]" instead modifies the phrase "the 1673.69 acres out of the Caleb Bennett Survey." Under this interpretation, the 1,673.69 acres referred to in the "Tract 2" description are the same 1,673.69 acres "described" in the Export Lease—but *before* the 400.15-acre Hamman Lease tract is excluded. This interpretation is reasonable because the Export Lease does, in fact, "describe" a tract of exactly 1,673.69 acres—even though it then explicitly states that the lease does not *apply* to all of that tract (that is, the Hamman Lease tract is part of the 1,673.69-acre tract *described* in the Export Lease but is not part of the property actually *leased* by that instrument). Under this interpretation, the Option Agreement's reference to "1,210.8824 acres" could be viewed as merely referring to North Shore's right to select a certain amount of land out of the 1,673.69 acres made available to it.[14] This interpretation, favored by North Shore, would mean that North Shore had the option to lease any 1,210.8824 acres out of the entire 1,673.69-acre tract—including the Hamman Lease tract, where it drilled its well.

Harkins and Dynamic contend that this interpretation is unreasonable because it would contravene the statute of frauds. *See, e.g., Bailey v. Mullens*, 313 S.W.2d 99, 102 (Tex. Civ. App.—San Antonio 1958, writ ref'd n.r.e.) ("A sound rule of construction

---

[14] North Shore notes that paragraph 14 of the Option Agreement, quoted above, explicitly mentions that there is an "Oil, Gas, and Mineral Lease covering part of Said Land"; and that, while the Hamman Lease had expired at the time the Option Agreement was entered into, there were two other tracts within "Tract 2" that had active oil and gas leases still in effect at that time. According to North Shore, this is why the Option Agreement only gave it the right to select 1,210.8824 out of 1,673.69 total acres in "Tract 2."

17

requires an interpretation under which the deed will be valid and operative in preference to one which will nullify it.").  With respect to property descriptions, the statute of frauds requires "a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings without resorting to oral testimony."  *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978).  Harkins and Dynamic claim that North Shore's interpretation of the Option Agreement fails this test because, though it purports to allow North Shore to select a certain amount of acreage, it does not contain express "selection language" explicitly granting North Shore the right to do so.  However, "selection agreements" have been upheld as enforceable despite the statute of frauds.  *See, e.g., Stekoll Petroleum Co. v. Hamilton*, 255 S.W.2d 187, 190 (Tex. 1952); *Eland Energy, Inc. v. Rowden Oil & Gas, Inc.*, 914 S.W.2d 179, 182 (Tex. App.—San Antonio 1995, writ denied).  Harkins and Dynamic note that the cases in which "selection agreements" have been upheld largely involve contracts expressly and explicitly giving the grantee the right to select acreage to lease or purchase.  However, they do not cite case law indicating that such an agreement cannot be found by implication.  Moreover, it is a rule of construction of deeds that they are to be most strongly construed against the grantor and in favor of the grantee, and this rule applies to reservations and exceptions.  *See Commerce Trust Co. v. Lyon*, 284 S.W.2d 920, 921 (Tex. Civ. App.—Fort Worth 1955, no writ); *see also Gonyea v. Kerby*, No. 10-12-00182-CV, 2013 WL 4040117, at *3 (Tex. App.—Waco Aug. 8, 2013, no. pet. h.) (mem. op.).  We do not believe that North Shore's interpretation of the Option Agreement would render the

agreement void under the statute of frauds, and we disagree with appellants' contention that North Shore's interpretation is unreasonable for that reason.

Because the Option Agreement is capable of more than one reasonable interpretation, it is ambiguous. *See Milner*, 361 S.W.3d at 619. However, that does not necessarily mean that summary judgment was improper. Summary judgment in favor of North Shore would still be proper if North Shore established as a matter of law through extrinsic evidence that the parties intended, despite the ambiguous nature of the property description, to include the 400.15-acre Hamman Lease tract as part of the area optioned to North Shore. *See* TEX. R. CIV. P. 166a(c). We conclude that North Shore met this burden. Its summary judgment evidence, including Schaper's affidavit, established that the parties initially believed that the Option Agreement covered the Hamman Lease tract and that doubts arose only after Dynamic became involved. Further, maps produced by Dynamic in discovery showed that, at least initially, the Hamman Lease tract was believed to be included in the area optioned to North Shore. Finally, it is undisputed that the Hamman Lease expired prior to the parties' execution of the Option Agreement. This evidence establishes as a matter of law that the parties intended, at the time the Option Agreement was made, for North Shore to obtain the option to lease the 400.15-acre Hamman Lease tract (in addition to the remainder of the 1,673.69-acre tract described in the Export Lease).

Considering North Shore's evidence, we conclude that North Shore established its entitlement to judgment as a matter of law on the issue of whether the well was drilled on land covered by the Option Agreement. The burden therefore shifted to Harkins and Dynamic to produce evidence raising a fact issue. *See* TEX. R. CIV. P.

19

166a(c). However, the only evidence attached to their response to North Shore's summary judgment motion was an excerpt from a deposition of one of the Harkins family members. The deposition testimony deals principally with circumstances surrounding the formation of the easement on Harkins's property in 2009 and does not constitute any evidence indicating that the parties intended to exclude the 400.15-acre Hamman Lease tract from the optioned area at the time the Option Agreement was executed. Therefore, summary judgment in favor of North Shore on this issue was proper. We overrule Harkins's first issue.

### 4. Exclusive Right to Explore

Harkins's second issue and Dynamic's seventh issue contend that North Shore did not have an exclusive right to conduct oil and gas exploration on the land at issue. We construe these issues as challenging the trial court's conclusion, set forth in its summary judgment for North Shore, that Dynamic "does not have the right to conduct exploratory operations" on the land described in the Option Agreement during the term of that agreement.

Harkins and Dynamic are correct in noting that the Option Agreement, in and of itself, did not pass title or transfer, sell, or convey any interest in property. *See Roberts v. Armstrong*, 231 S.W. 371, 374 (Tex. Comm'n App. 1921, judgm't adopted) ("The defendant in error did not, by the option contract, acquire any title to the lands. At most, he secured only the right to acquire an interest in the lands by complying, at his election, with the stipulations on his part."); *see also Jarvis v. Peltier*, 400 S.W.3d 644, 650 (Tex. App.—Tyler 2013, no pet.) ("An option is a privilege or right that the owner of the property gives another to buy certain property at a fixed price within a certain

20

time. . . . By acquiring an option to purchase property, the holder of the option purchases the right to compel a sale of the property on stated terms before the expiration of the option."); *Kondos v. Carrico*, No. 02-05-00374-CV, 2007 WL 704587, at *3 (Tex. App.—Fort Worth Mar. 8, 2007, pet. denied) (mem. op.) ("An option contract does not pass title or transfer, sell, or convey any interest in property.").

However, North Shore produced summary judgment evidence establishing that it invoked its option by making a payment to Harkins in September 2009, thereby giving it exclusive rights to the land at issue. In particular, the Option Agreement provided as follows:

> [North Shore] has the right to exercise its exclusive option to acquire an Oil and Gas Lease covering all or a portion (as hereinafter provided) of Said Land pursuant to the terms and provisions set forth on the Oil and Gas Lease form attached as Exhibit "B", (hereinafter called the "Oil and Gas Lease") by tendering a check payable to [Harkins] in an amount equal to Two Hundred Dollars ($200.00) per net mineral acre . . . .

> The Oil and Gas Lease shall be dated as of the date [Harkins] is notified by [North Shore] that [North Shore] has elected to exercise its option, shall cover lands described thereon by [North Shore], and shall provide for a Delay Rental payment to [Harkins] in the amount of Fifty Dollars ($50.00) per net mineral acre owned by [Harkins] in the lands described therein in accordance with the terms and provisions of the Oil and Gas Lease form set forth on Exhibit "B".

Exhibit "B" to the Option Agreement is a form lease agreement that states in part the following:

> [Harkins], in consideration of TEN DOLLARS ($10.00) and other valuable consideration in hand paid, of the royalties herein reserved, and of the agreements of [North Shore] herein contained, and upon the terms and conditions hereinafter stated, hereby grants, leases and lets, exclusively unto [North Shore], for the purposes of investigating, exploring, prospecting, drilling and mining for and producing oil and gas . . . .

21

It is undisputed that North Shore complied with the Option Agreement by making a payment, in September 2009, of $200 per net mineral acre of land that it desired to lease.[15] Pursuant to the unambiguous and specific terms of the Option Agreement, that payment was sufficient to exercise North Shore's option and thereby triggered the creation of a lease agreement under the terms set forth in Exhibit "B" to the Option Agreement, effective as of the date of the payment. And, the form lease agreement contained in Exhibit "B" clearly states that North Shore's rights as to the selected land are "exclusive." This evidence established that Dynamic did not have the right to conduct exploratory operations on the land covered by the Option Agreement and upon which North Shore exercised its option to lease.

Appellants did not produce evidence creating a fact issue as to: (1) whether North Shore's September 2009 payment to Harkins triggered the creation of a lease agreement; or (2) whether the lease agreement provided exclusive rights to North Shore. *See* TEX. R. CIV. P. 166a(c). Summary judgment was therefore proper on this issue. We overrule Harkins's second issue and Dynamic's seventh issue.

## B. Tortious Interference With Contract

By its third, fourth, and fifth issues, Dynamic contends that the evidence adduced at trial was legally and factually insufficient to support North Shore's tortious interference with contract claim.

---

[15] As amply noted above, Harkins and Dynamic dispute that the land selected by North Shore was included in the Option Agreement's property description. They do not, however, dispute that North Shore complied with the other terms of that agreement detailing how North Shore was to exercise its option.

### 1.    Standard of Review and Applicable Law

In evaluating the legal sufficiency of the evidence supporting a verdict, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it.  *City of Keller*, 168 S.W.3d at 822.  We will sustain a legal sufficiency challenge only if:   (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.  *Id.* at 810.  In reviewing factual sufficiency, we consider all the evidence in a neutral light and will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.  *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

"The elements of tortious interference with a contract are (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

### 2.    Analysis

Dynamic's third issue is predicated on the position that the land selected by North Shore was expressly excluded from the property description in the Option Agreement.  Dynamic's fourth issue is predicated on the position that North Shore's interpretation of the Option Agreement would render it void under the statute of frauds. Having already rejected those positions, we overrule Dynamic's third and fourth issues.

23

By its fifth issue, Dynamic argues that there was insufficient evidence showing that it acted willfully and intentionally. *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 77. We disagree. It is uncontroverted that Dynamic first approached Harkins about obtaining a lease on the subject land and that it was Dynamic that alerted Harkins to the potential problem with the location of North Shore's well. It is also undisputed that Harkins and Dynamic were aware of the North Shore lease at the time they entered into their own lease agreement, the Dynamic Lease, which explicitly authorized Dynamic to conduct exploration and drilling. Dynamic asserts that this does not constitute evidence of willful or intentional interference because Dynamic and Harkins believed at the time that the North Shore lease excluded the 400.15 acres leased to Dynamic. However, we have concluded that the trial court did not err in ruling at the summary judgment stage that the 400.15-acre Hamman Lease tract was, in fact, covered by North Shore's Option Agreement. Moreover, even if we had agreed with Dynamic's interpretation of the Option Agreement, the Seismic Permit executed by Harkins and Dynamic in April 2010 explicitly permitted Dynamic to conduct seismic exploration on the *entire* 1,673.69-acre plot identified in the Export Lease, not just the 400.15-acre Hamman Lease tract. And, we have already determined that the trial court did not err in granting summary judgment concluding that North Shore enjoyed exclusive exploration rights under the Option Agreement. Finally, the Dynamic Lease agreement itself, which was part of the evidence before the jury, contained comprehensive indemnification provisions which specifically referenced the Option Agreement. We conclude that the evidence was legally and factually sufficient to support a finding that Dynamic willfully and intentionally interfered with the Option Agreement.

24

Dynamic further contends by its fifth issue that the evidence was insufficient to support a finding on proximate causation. The jury awarded $574,000 in damages based on North Shore's theory that Dynamic's interference with the Option Agreement caused North Shore's principal investor, Brad Baker, to refuse to fund additional development on the leased land. The jury was instructed to award damages based only on the following element: "The loss by North Shore of net profits under its agreement with Brad Baker, LLC, that was a natural, probable, and foreseeable consequence of Dynamic's interference with the Option Agreement." *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001) ("[A]n appellate court is to review the evidence according to the jury charge given and the jury findings in response to that charge."); *see also, e.g., IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004) ("The two elements of proximate cause are cause in fact (or substantial factor) and foreseeability."). At trial, one of the Harkins family members, Patricia Harkins, testified that the family would not have agreed to execute the Dynamic Lease if Bishop and Dynamic had not informed the family that there was a "problem" with the location of North Shore's well. Troy West, one of North Shore's co-owners, testified that Baker was involved in North Shore's negotiations with Dynamic in early 2010 over obtaining permission to perform seismic exploration, and that Dynamic's principals were aware of Baker's financial involvement in North Shore's activities. Dynamic and Harkins executed the Seismic Permit and Dynamic Lease agreements only after the negotiations failed. This evidence was legally and factually sufficient to support a finding that Baker's financial withdrawal was "a natural, probable, and

25

foreseeable consequence of Dynamic's interference with the Option Agreement." We overrule Dynamic's fifth issue.

## C.    Damages

### 1.    Lost Profits

Dynamic's sixth and eighth issues challenge the sufficiency of the evidence supporting lost profits damages awarded by the jury. As noted, the jury awarded $574,000 in lost profits damages based solely on the effect of Dynamic's interference on the then-existing contract between North Shore and Baker.

"The basic measure of actual damages for tortious interference with contract is the same as the measure of damages for breach of the contract interfered with, to put the plaintiff in the same economic position he would have been in had the contract interfered with been actually performed." *Am. Nat'l Petroleum Co. v. Transcont'l Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990). In order to recover lost profits, a party must produce sufficient competent evidence to enable the fact finder to determine the net amount of the loss with reasonable certainty. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992); *D/FW Commercial Roofing Co. v. Mehra*, 854 S.W.2d 182, 187 (Tex. App.—Dallas 1993, no writ). The evidence relative to the profits must not be uncertain or speculative. *Mehra*, 854 S.W.2d at 187 (citing *Sw. Battery Corp. v. Owen*, 131 Tex. 423, 426, 115 S.W.2d 1097, 1098 (1938)). However, it is not necessary that the lost profits be subject to exact calculation. *Holt Atherton*, 835 S.W.2d at 84.

> What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. Although supporting

26

documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.

*ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010) (citations omitted). Courts have held that a party seeking lost profits damages must show either a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty. *Allied Bank W. Loop, N.A. v. C.B.D. & Assocs., Inc.*, 728 S.W.2d 49, 54–55 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (citing *Sw. Battery Corp.*, 131 Tex. at 423, 115 S.W.2d at 1097).

Dynamic's sixth issue contends that North Shore's evidence of lost profits damages was insufficient because there was no evidence as to expenses that North Shore would incur in connection with additional wells that would have been drilled had Baker continued his investment. Dynamic cites *County Management, Inc. v. Butler*, in which the Austin Court of Appeals held:

> Proof of loss involving undrilled wells, lost leases, and royalties are, by their very nature difficult, to show. Nevertheless, before a plaintiff can recover damages, he must prove with reasonable certainty the damages he suffered from the defendant's breach. When lost profits are sought as an element of damages, the plaintiff must necessarily show what those profits would have been. The plaintiff can satisfy this burden through the introduction of evidence showing the initial and continued production of wells drilled on the lands in controversy (if available) and on other lands in the area. A qualified expert witness should then be produced who, after examining the logs and other relevant information from the surrounding wells, gives an opinion as to the probability of obtaining production and the extent of such production on the land in question. Such matters as production costs, geological trends, proration, kind and quality of the oil and countless other items, where applicable, should also be referred to by the expert in making his opinion.

650 S.W.2d 888, 889–93 (Tex. App.—Austin 1983, writ dism'd by agrm't) (internal citations and quotations omitted), *abrogated on other grounds by Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 18 (Tex. 2008).

27

In response, North Shore points to testimony by West detailing the financial arrangement Baker had made with North Shore:

> The way we had set the contract up is Mr. Baker would pay for basically everything and that included acquiring leases and options, the cost of any type of technology that we may use, all the costs for drilling, testing, and completing all the wells . . . .

> [I]n the front end the only way we [North Shore] were going to make any significant amount of money was to do what we call a cost plus 10 situation with Mr. Baker which means the total cost of the well would be paid and then whatever that cost was, we would multiply that times 10 percent and he would forward that money on to North Shore.

> The reason it was set up that way is because since [Baker] was fronting all the money for the project, he would get all the lion's share of all the royalties on the project until he had earned back the money that he invested, at which time he and North Shore . . . would participate almost on an equal level basis in the distribution of the production of the wells.

North Shore also directs us to testimony by Schaper stating that North Shore drilled wells on acreage adjacent to Harkins's land and that two out of three wells were successful. Schaper testified that, pursuant to North Shore's "cost plus ten" arrangement with Baker, Baker made payments of $29,631.32 and $43,641.15 to North Shore—a total of over $73,000—and that this amount represented North Shore's net profit with respect to the well at issue in this case. The evidence, including testimony by both West and Schaper, was uncontroverted that North Shore planned to drill up to ten more wells on the optioned land, and West testified that North Shore's agreement with Baker was premised on the expectation that 70% of the wells drilled would be successful. Schaper testified that North Shore's net profits deriving from any additional wells may vary slightly from the $73,000 earned from the drilling of the first well, but that $67,000 was a reasonable approximation of the net profit North Shore would have earned from the drilling of each additional successful well under the agreement with

28

Baker. Schaper further stated that $35,000 would be a reasonable approximation of the net profit North Shore would have earned from the drilling of each additional dry hole.

We find that this evidence supported the jury's award of $574,000 in lost profits damages. In particular, the testimony of West and Schaper supported findings that: (1) North Shore would have drilled up to ten additional wells on Harkins's land had Baker not withdrawn from participation; (2) approximately seven (i.e., 70% of ten) of the additional wells would have likely been successful and three (i.e., 30% of ten total additional wells) would have likely been dry; (3) each additional successful well would have resulted in a net profit to North Shore of approximately $67,000; (4) each additional unsuccessful well would have resulted in a net profit to North Shore of approximately $35,000. This evidence constituted "objective facts, figures, or data," *see Swinnea*, 318 S.W.3d at 876, supporting a lost profits damages award of approximately $574,000.[16]

We disagree with Dynamic's assertion that North Shore failed to establish the expenses that it would have incurred in connection with the drilling of additional wells. As West testified, North Shore's "cost plus ten" arrangement with Baker provided that Baker would be responsible for the initial expenses involved with "drilling, testing, and completing additional wells" and that North Shore would be entitled to net profit of ten percent of the expenses incurred. The jury could have reasonably determined from the testimony of West and Schaper—which was based in part on "evidence showing the initial and continued production of wells drilled on the lands in controversy (if available)

---

[16] The seven anticipated successful wells correspond to $469,000 ($67,000 times seven). The three anticipated unsuccessful wells correspond to $105,000 ($35,000 times three). Those two figures total $574,000.

29

and on other lands in the area," *Butler*, 650 S.W.2d at 890—that North Shore would have earned net profits of approximately $574,000 were it not for Dynamic's interference.  Dynamic's sixth issue is overruled.

Dynamic characterizes its eighth issue as follows:

> Before a party is entitled to an award of lost profits, there must be some evidence that the plaintiff could satisfy all required conditions for profits. Here, [Harkins] had the contractual right to withhold their consent to North Shore exercising any right to seismic exploration.  Because North Shore could not establish that a condition to its right to seismic exploration had been met, there was legally and factually insufficient evidence to support the jury's award of damages for the geophysical trespass claim.

Dynamic is correct that, under the terms of the form lease agreement attached as Exhibit "B" to North Shore's Option Agreement, North Shore was obligated to obtain Harkins's permission prior to conducting seismic exploration on the leased land. However, West and Schaper testified that North Shore did not intend to conduct seismic exploration because the wells they intended to drill were too shallow for such exploration techniques to be worthwhile.  Moreover, we have already determined that the award of lost profits damages was justified based on the jury's finding that Dynamic tortiously interfered with the Option Agreement.  For these reasons, we do not find this argument persuasive.  Dynamic's eighth issue is overruled.

### 2.    Malice

By its tenth issue, Dynamic asks that we reverse the award of exemplary damages because the evidence was legally and factually insufficient to support the jury's finding that Dynamic's interference with the Option Agreement resulted from malice.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (West Supp. 2011) (providing generally that exemplary damages may be awarded only upon a finding of

30

fraud, malice, or gross negligence). Because malice must be proved by clear and convincing evidence, *see id.* § 41.003(b), we apply a more exacting sufficiency review on appeal by looking at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding of malice was true. *See Sw. Bell Co. v. Garza*, 164 S.W.3d 607, 622 (Tex. 2004). We review the evidence according to the jury charge given and the jury findings in response to that charge. *Barker v. Eckman*, 213 S.W.3d 306, 313 (Tex. 2006). The jury charge in this case defined malice as "a specific intent by Dynamic to cause substantial harm to North Shore."

In response to this issue, North Shore notes that Dynamic knew, prior to approaching North Shore and subsequently Harkins about conducting exploration on the subject land, that North Shore had drilled a successful well on the land and had planned on drilling several additional wells there. North Shore also points to the Letter of Intent executed by Dynamic and Harkins, which expressly references North Shore and refers to the subject well as belonging to North Shore, and the Dynamic Lease, which requires Harkins to cooperate in litigation against North Shore and indemnifies Harkins against any liabilities incurred in such litigation.

North Shore also claims that the malice finding was supported by the trial testimony of Dynamic vice president Gerald Graham. Graham had previously executed an affidavit, attached to Dynamic's counterclaim and application for the appointment of a receiver, in which he swore to the truth of the statements made in those documents based on his personal knowledge. One of those statements was: "It is believed that [North Shore] may secret the proceeds of production of hydrocarbons for purposes of

31

removing such proceeds from the jurisdictional control of this Court." At trial, North Shore's counsel, characterizing this accusation as one of "commercial extortion," asked Graham: "You did not have any facts that supported the commercial extortion claim, sir; is that true?" Graham replied: "It's an allegation, not a fact." North Shore argues that this statement amounted to an admission by Graham that his affidavit was false and therefore constitutes proof of malice on the part of Dynamic.[17]

Dynamic contends that this evidence was insufficient to support a finding of malice because there was other evidence establishing that Dynamic, in contracting with Harkins, relied on the advice of its attorneys that North Shore's well constituted a geophysical trespass. However, the jury was entitled to disbelieve that evidence. *See City of Keller*, 168 S.W.3d at 819 ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony."). Moreover, even if the jury believed that Dynamic relied on the advice of its attorneys, that would not negate the evidence establishing that Dynamic, in seeking to secure a lease on the disputed 400.15 acres, knew that North Shore had already drilled a productive well on that land and knew that North Shore claimed rightful possession of the land pursuant to the Option Agreement. Based on this evidence alone, the jury could have "formed a firm belief or conviction," *see Garza*, 164 S.W.3d at 622, that Dynamic had the "specific intent to cause substantial harm to North Shore."

---

[17] It is disputable whether this statement, by itself, showed that Dynamic acted with malice. Graham, in averring to the truth of the statements made in the receivership application, merely confirmed that Dynamic "believed" that North Shore "may secret" production proceeds out of the trial court's jurisdiction. Although it was shown that North Shore did not in fact do so, Graham confirmed at trial that this was Dynamic's "belief" at the time the affidavit was executed, and he did not implicitly concede, as North Shore argues, that the belief was fabricated or baseless. In any event, we need not address whether this statement supported the malice finding because of our conclusion herein that evidence apart from Graham's testimony was sufficient to support that finding.

32

Dynamic additionally argues by its tenth issue that any evidence of malice was "judicially privileged and should not have been admitted into evidence" because the evidence consisted of statements made during the course of litigation. *See James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982) (citing *Reagan v. Guardian Life Ins. Co.*, 140 Tex. 105, 111, 166 S.W.2d 909, 912 (1942) ("Any communication, oral or written, uttered or published in the due course of a judicial proceeding is absolutely privileged and cannot constitute the basis of a civil action in damages for slander or libel.")). This argument fails for two reasons. First, Dynamic did not object to admission of the evidence at trial. *See* TEX. R. APP. P. 33.1; TEX. R. EVID. 103(a)(1). Second, even if Dynamic had preserved its issue for review, Dynamic has not cited any authority, and we find none, establishing specifically that such statements are inadmissible to prove malice. Instead, the cases cited provide only that such statements may not form the basis of a defamation suit. *See James*, 637 S.W.2d at 916 ("Communications in the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made."); *see also Bird v. W.C.W.*, 868 S.W.2d 767, 771 (Tex. 1994); *Montemayor v. Ortiz*, 208 S.W.3d 627, 653–54 (Tex. App.—Corpus Christi 2006, pet. denied); *McIntyre v. Wilson*, 50 S.W.3d 674, 682–83 (Tex. App.—Dallas 2001, pet. denied); *Griffin v. Rowden*, 702 S.W.2d 692, 695 (Tex. App.—Dallas 1985, writ ref'd n.r.e.).[18]

---

[18] North Shore notes correctly that, under Dynamic's theory, all deposition testimony would be absolutely privileged—and inadmissible at trial—because any such testimony would necessarily have been made during the course of litigation. This position is belied by, among other things, the rules of evidence, which explicitly allow for prior sworn testimony to be admitted as evidence in some circumstances. *See, e.g.,* TEX. R. EVID. 613 (regarding admissibility of prior sworn testimony to impeach testifying witnesses).

33

Viewing the evidence in the light most favorable to the verdict, *see Garza*, 164 S.W.3d at 622, we conclude that the evidence was legally sufficient to support a finding of malice, as defined in the jury charge, by clear and convincing evidence. We further conclude that the evidence was factually sufficient to support the finding. Dynamic's tenth issue is overruled.

### 3.   Double Recovery

Dynamic argues by its ninth issue that the trial court erred by awarding damages to North Shore representing both (1) the market value of seismic testing done by Dynamic and (2) the market value of the processed seismic data. Dynamic contends that the award of damages on both grounds constituted an impermissible double recovery. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000) ("Under the one satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered.").

Question number five of the jury charge asked: "What amount of money, if paid now in cash, would fairly and reasonably compensate North Shore for the value of Dynamic's use and occupation of Tract 1 and Tract 2 for seismic testing?" The jury was asked to assess both "[t]he reasonable market value of the seismic testing at the time and place that it occurred" and "[t]he reasonable value of the processed seismic data." The jury answered $88,800 and $46,250 respectively, and those amounts were awarded to North Shore in the final judgment.

The damages were apparently awarded on North Shore's assumpsit cause of action, *see Siegler v. Ginther*, 680 S.W.2d 886, 890 n.1 (Tex. App.—Houston [1st Dist.] 1984, no writ) ("'Assumpsit' is the recovery for the unjust retention of a benefit to the

34

loss of another, or the retention of money of another against the fundamental principles of justice and equity."), and were based on testimony by Schaper and James Edsel, an expert witness for North Shore. Schaper testified that, "under a normal seismic permit agreement," the right to conduct seismic exploration would cost approximately $30 to $50 per acre. She further testified that, had North Shore performed seismic exploration on the optioned land, it would have been able to license the processed seismic data to a "seismic bank" for approximately $10,000 per square mile. Edsel, a member of the Interstate Oil and Gas Compact Commission, was asked to "outline for the jury the elements of value that North Shore could have expected to receive if it had been paid for a 3D seismic shoot across its property." Edsel stated that he prepared a report on that topic and that he concluded that North Shore would have received $50 per acre "for the right to shoot seismic" and $10,000 per square mile[19] as "a resale value of the seismic [data]."

We agree with Dynamic that the two elements of recovery—i.e., the value of a permit to conduct seismic exploration on the one hand, and the value of the processed seismic data on the other—address the same alleged harm suffered by North Shore. As Dynamic states:

> If North Shore had sold a permit to a third party to shoot seismic, it would not have been able to sell that data to a seismic library, because, even if North Shore had negotiated a right to see the data, the permittee would have owned the data and likely would have retained the right to sell it to a seismic library. Similarly, if North Shore had shot the seismic itself and sold the data to a seismic library, it would not have been able to permit any seismic rights to a third party because no third party would have been interested in reshooting the land.

---

[19] Edsel actually testified that the resale value of the processed seismic data would be "$10,000 per acre." The parties do not dispute that he actually meant $10,000 per square mile.

It is apparent that the $30 to $50 per acre cost, as testified to by Schaper and Edsel, encompassed not only the right to perform seismic exploration on the land but also to license or sell the data resulting from that exploration. It would make little sense for a party to pay substantial sums for an exploration permit if it did not retain exclusive ownership of the data generated by that exploration. The award of both forms of damages therefore constituted a double recovery.

We sustain Dynamic's ninth issue. Assuming that North Shore would have elected the larger damages award if given the opportunity, we modify the trial court's judgment to delete the $46,250 award representing "[t]he reasonable value of the processed seismic data." The total amount of actual damages awarded in the judgment as modified is therefore $662,800.[20] As a result of this reduction in the actual damages awarded, we further modify the judgment to reduce the exemplary damages award to $1,325,600.[21] *See In re Columbia Med. Ctr.*, 306 S.W.3d 246, 248 (Tex. 2010) ("Punitive damages awards that are statutorily capped are required to be recalculated when the actual damages against which they are measured are reduced on appeal.").

---

[20] $574,000 in actual damages corresponding to the tortious interference claim, plus $88,800 in actual damages corresponding to the assumpsit claim.

[21] "Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of: (1)(A) two times the amount of economic damages; plus (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or (2) $200,000." TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b) (West Supp. 2011). The trial court reduced the jury's exemplary damages award to $1,148,000, which was apparently intended to represent two times $709,050, the amount of actual damages awarded by the jury (we note that two times $709,050 is, in fact, $1,418,100). We have modified the judgment to reduce the exemplary damages award to $1,325,600, or two times $662,800 (which is the amount of actual damages pursuant to our modification of the judgment). *See id.*

**D.     Jury Charge**

By its eleventh issue, Dynamic contends that the trial court erred in omitting from the jury charge questions and instructions related to its justification and failure-to-mitigate defenses.

Jury charge error is reviewed for abuse of discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam). To determine whether an alleged jury charge error is reversible, we consider the parties' pleadings, the evidence presented at trial, and the charge in its entirety. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663 (Tex. 1999). The goal of a jury charge is to submit the issues for decision logically, simply, clearly, fairly, correctly, and completely, and the trial court has broad discretion in accomplishing that end as long as the charge is legally correct. *Id.* at 664.

A trial court must submit to the jury the questions and instructions "which are raised by the written pleadings and the evidence." TEX. R. CIV. P. 278; *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002). This is a substantive, non-discretionary directive to trial courts, requiring them to submit requested questions to the jury if the pleadings and any evidence support them. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992); *VIA Metro. Transit v. Garcia*, 397 S.W.3d 702, 705 (Tex. App.—San Antonio 2012, no pet.).

**1.     Justification Defense**

Justification is an affirmative defense to tortious interference. *Prudential Ins. Co. of Am.*, 29 S.W.3d at 80. The defense can be based on the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. *Id.* (citing *Tex. Beef Cattle Co. v. Green*, 921

S.W.2d 203, 211 (Tex. 1996)). A jury question on justification is presented only when the court decides that although no legal right to interfere exists, the defendant has nevertheless produced evidence of a good faith, albeit mistaken, belief in a colorable legal right. *Tex. Beef Cattle Co.*, 921 S.W.2d at 211. Dynamic claims that the evidence supported its request for a jury question on whether it had a "good-faith claim to a colorable legal right" because it relied on the advice of its attorneys that North Shore's well was drilled on land not covered by the Option Agreement.

We have already found that the property description in the Option Agreement was ambiguous. However, we do not believe the trial court was compelled to submit a question on justification here, for three reasons. First, the applicable rule of civil procedure states: "Failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment . . . ." TEX. R. CIV. P. 278. Dynamic requested the following question in writing: "Did Dynamic have a good-faith belief that the 400.15-acre tract it attempted to lease from the Harkins Defendants was not covered by North Shore's option agreement and was available for lease?" This question does not precisely track the applicable law in that it does not refer to a "colorable legal right." *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 80; *Tex. Beef Cattle Co.*, 921 S.W.2d at 211.

Second, even assuming that the submitted question was in "substantially correct wording," *see* TEX. R. CIV. P. 278, the evidence adduced at trial did not support a justification defense. In particular, the Seismic Permit executed by Dynamic and Harkins in April of 2010 granted Dynamic the right to conduct seismic exploration on,

38

*inter alia*, the entire 1,673.69-acre Export Lease tract (of which the 400.15-acre Hamman Lease tract is a part). Although Harkins and Dynamic may have had a good-faith belief that the 400.15-acre Hamman Lease tract was excluded from North Shore's lease under the Option Agreement, there was no evidence adduced indicating that the status of the remainder of the 1,673.69-acre Export Lease tract was ambiguous. Instead, the undisputed evidence showed that the only land in dispute was the 400.15-acre Hamman Lease.

Third, even if Harkins and Dynamic had limited their transactions to only the 400.15-acre Hamman Lease tract, the evidence arguably did not support a finding that Dynamic had a "colorable legal right" to that land. In *Bennett v. Computer Associates International, Inc.*, the Amarillo Court of Appeals discussed the precise meaning of the term "colorable legal right":

> [T]he court in *Texas Beef Cattle*[, 921 S.W.2d at 211,] left the term "colorable right" undefined. Nevertheless, it has been construed, in other settings, as "an appearance of right" which would lead others, "without inquiry, to suppose" the existence of the right claimed. *Cox v. Houston & T.C.R. Co.,* 68 Tex. 226, 4 S.W. 455, 457 (1887) (involving a colorable right to public office). This interpretation comports with the definitions given the word "colorable" in the sixth edition of *Black's Law Dictionary* and in *Webster's Third New International Dictionary.* According to the former, it means "having the appearance of truth," while in the latter, it means "seemingly valid and genuine [or] having an appearance of truth, right, or justice . . . ." Thus, we conclude[] that a right is colorable if it appears, without further inquiry (that is, if it appears on its face), genuine, truthful, valid, or existing.

932 S.W.2d 197, 202 (Tex. App.—Amarillo 1996, no writ). Here, Graham conceded at trial that the initial map of the subject land prepared by Dynamic showed that the 400.15-acre Hamman Lease tract was part of the land optioned to North Shore. He agreed with North Shore's counsel that the map represented Dynamic's "first impression

based on the way things appeared . . . from looking in the public records without further inquiry." Graham stated that Dynamic later revised its position based upon additional research. However, under the definition set forth in *Bennett*, this testimony would not be sufficient to support a jury question on justification because Graham already stated that Dynamic's initial impression "without further inquiry" was that the Option Agreement covered the Hamman Lease tract. *See id.*

In light of the foregoing, we cannot conclude that the trial court abused its discretion by denying Dynamic's request for a jury charge question on justification.

### 2. Failure-to-Mitigate Instruction

Dynamic next argues by its eleventh issue that the trial court erred by failing to include the following instruction with respect to North Shore's alleged failure to mitigate damages: "Do not include in your answer any amount that you find North Shore could have avoided losing by continuing to pursue its drilling program on land which Dynamic had not attempted to lease." Dynamic claims that, even if North Shore was unable to drill further wells on the 400.15-acre Hamman Lease tract, it "could have continued drilling" on the second, 570.941-acre tract that it attempted to lease pursuant to the Option Agreement.

The mitigation of damages doctrine requires an injured party to exercise reasonable care to minimize its damages if the damages can be avoided with only slight expense and reasonable effort. *Harris County v. Smoker*, 934 S.W.2d 714, 721 (Tex. App.—Houston [1st Dist.] 1996, writ denied) (citing *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995) ("Where a party is entitled to the benefits of a contract and can save himself from the damages resulting from its breach

40

at a trifling expense or with reasonable exertions, it is his duty to incur such expense and make such exertions.")).  Here, there was no evidence adduced that North Shore could have continued its drilling program on the 570.941-acre tract "with only slight expense and reasonable effort."  *See id.*  Instead, the evidence was uncontroverted that the drilling of each additional well would have cost North Shore over $600,000, and that North Shore's primary source of capital—Baker—had withdrawn his participation in the project.  In light of these facts, the trial court did not err in refusing to submit a mitigation of damages instruction.

Dynamic's eleventh issue is overruled.

**E.     Discussion of Prior Summary Judgment Rulings**

By its twelfth issue, Dynamic contends that the trial court erred "in discussing, and in allowing North Shore to discuss, the summary judgment rulings in witness examinations, jury arguments, and charge instructions."  Dynamic points to several instances in the trial record where North Shore's attorneys emphasized that the trial court had already ruled, by its summary judgment rulings, on the meaning of the property description in the Option Agreement.  The record reflects that the trial court sustained North Shore's objections to questions by Dynamic's counsel regarding the meaning of the property description, on the basis that those questions were already resolved by virtue of the summary judgment rulings.  Moreover, the trial court denied Dynamic's oral request to instruct the jury that the summary judgment orders "were not entered" until September 2011 and "[are] not final"; whereas the trial court granted North Shore's request for the following instruction:

> You are instructed that the Court has determined that the Option Agreement is valid and enforceable, that it includes the 400.15 acres that

41

the Harkins Defendants leased to Dynamic while the Option Agreement was in force, and that it confers upon North Shore the exclusive right to explore for oil and gas in the area covered by the Option Agreement, including seismic activities.

In support of this issue, Dynamic cites case law regarding the right to a fair trial guaranteed by the United States and Texas Constitutions. *See In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process.") (citing U.S. CONST. amend. IV); *Babcock v. Nw. Mem'l Hosp.*, 767 S.W.2d 705, 708 (Tex. 1989) (citing TEX. CONST. art. I); *Pitt v. Bradford Farms*, 843 S.W.2d 705, 707 (Tex. App.—Corpus Christi 1992, no writ) ("The trial judge should not comment, either directly or indirectly, on the weight of the evidence."); *Brown v. Russell*, 703 S.W.2d 843, 847 (Tex. App.—Fort Worth 1986, no writ) ("[A] presiding judge at a trial must conduct it in a fair and impartial manner and refrain from making unnecessary comments or remarks during the course of trial which may tend to result in prejudice to a litigant, or is calculated to influence the minds of the jury."); *Delaporte v. Preston Square, Inc.*, 680 S.W.2d 561, 563 (Tex. App.—Dallas 1984, writ ref'd n.r.e.) (noting that "a trial judge should remain impartial and not act as an advocate for either party"). However, Dynamic does not cite any authority, and we find none, establishing that when partial summary judgment is granted in advance of trial, discussion of the summary judgment rulings is necessarily unfair or prejudicial. Here, appellants' respective trial attorneys were able to question Dynamic's and Harkins's witnesses at length regarding their interpretation of the Option Agreement. Moreover, though Dynamic obliquely complains about the trial court's jury charge decisions, it does not explicitly argue that it was error to deny submission of Dynamic's requested instruction to the jury,[22] nor does

_____

[22] Even if Dynamic argued that issue explicitly, it would not have been preserved for our review,

42

it explicitly argue that it was error to submit North Shore's instruction. For the foregoing reasons, we overrule Dynamic's twelfth issue.

## F. Expert Damages Testimony

By its thirteenth issue, Dynamic argues that North Shore's expert testimony regarding seismic exploration damages was incompetent and inadmissible. *See* TEX. R. EVID. 705(c) ("If the court determines that the underlying facts or data do not provide a sufficient basis for the expert's opinion, . . . the opinion is inadmissible."); *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998) (holding that "[a]ll expert testimony should be shown to be reliable before it is admitted" and noting that expert testimony should be excluded if "there is simply too great an analytical gap between the data and the opinion proffered").

Evidentiary rulings are committed to the trial court's sound discretion. *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007). A trial court abuses its discretion when it rules without reference to any guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). If error is found, we will reverse only if: (1) the excluded evidence was controlling on a material issue; (2) the excluded evidence was not cumulative of other evidence; and (3) the error probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case on appeal. *See* TEX. R. APP. P. 44.1; *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000).

---

because the request for a jury instruction was only made orally. *See* TEX. R. CIV. P. 278 ("Failure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment.").

43

Dynamic argues specifically that the testimony of North Shore's expert, Edsel, was unreliable because: (1) he admitted that he stated in deposition that his estimate of $50 per acre for a seismic exploration permit was "subjective"; and (2) he testified that the processed seismic data was worth $10,000 per square mile to North Shore but that it would cost $40,000 to $60,000 per square mile to perform the seismic exploration.

We find that the trial court did not abuse its discretion in admitting this testimony. Edsel, an oil and gas executive with decades of experience, testified that he prepared a report on the subject land and concluded that a reasonable estimate of the cost of an exploration permit thereon was $50 per acre. He stated that he took into consideration the lack of shale gas and overall size of the tract in formulating his estimate. Dynamic does not cite authority stating that a qualified expert may not offer "subjective" opinions on issues falling within the witness's area of expertise, or that an expert is unqualified merely because his or her opinions may be characterized as "subjective." Further, the record reflects that the jury awarded lost profits damages based on North Shore's hypothetical drilling of additional wells pursuant to the Option Agreement, not seismic exploration. In any event, we have already reversed that portion of the trial court's judgment awarding damages to North Shore based on "[t]he reasonable value of the processed seismic data." Accordingly, Dynamic's argument that Edsel failed to take expenses into account when deriving his profit estimate is moot.

Dynamic's thirteenth issue is overruled.

## G.     Attorney's Fees

Finally, by his third issue, Harkins contends that the trial court erred in rendering judgment ordering Harkins to pay North Shore $405,338 in attorney's fees. Specifically,

Harkins contends that the award was improper because: (1) "Harkins did not breach any written contract," *see* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008) (authorizing the recovery of attorney's fees for a claim on an oral or written contract); (2) "North Shore did not plead or prove presentment"; *see id.* § 38.002 (West 2008); and (3) the award impermissibly included fees attributable to a reformation claim.

First, we disagree that Harkins did not breach any contract. The Option Agreement required Harkins to furnish leases to North Shore upon North Shore's payment of $200 per net mineral acre of land designated. It is undisputed that North Shore made the payment and Harkins did not furnish the leases because it believed that the land designated by North Shore was excluded from the Option Agreement's property description. We have already concluded that the trial court did not err in granting summary judgment rejecting that belief. Accordingly, we find that the award of attorney's fees was proper pursuant to section 38.001 of the civil practice and remedies code. *See id.* § 38.001(8).

Second, Harkins claims that North Shore failed to "plead or prove presentment." Section 38.002 of the civil practice and remedies code states that, to recover attorney's fees under section 38.001, "the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party" and "payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented." *Id.* § 38.002(2), (3). "The purpose of the requirement for presentation of a claim is to allow the person against whom it is asserted an opportunity to pay a claim within 30 days after they have notice of the claim without incurring an obligation for attorney's fees." *Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex. 1981). These requirements

45

"shall be liberally construed to promote its underlying purposes," TEX. CIV. PRAC. & REM. CODE ANN. § 38.005 (West 2008), and "[n]o particular form of presentment is required." *Jones*, 614 S.W.2d at 100. However, settlement negotiations and offers do not constitute presentment, *Commercial Union Ins. Co. v. La Villa Indep. Sch. Dist.*, 779 S.W.2d 102, 107 (Tex. App.—Corpus Christi 1989, no writ), nor does the filing of suit or an allegation of demand in the pleadings. *Jim Howe Homes, Inc. v. Rogers*, 818 S.W.2d 901, 904 (Tex. App.—Austin 1991, no writ).

Here, the trial court made the following findings of fact with regard to presentment:

2.    North Shore's claim against [Harkins] was fully presented to [Harkins] prior to the filing of suit by numerous events in the course of conduct between the parties including, but not limited to, exercising North Shore's option to acquire an oil and gas lease by sending its letters and checks to [Harkins], North Shore taking physical possession of the property as to which the lease option had been exercised and drilling a gas well on it, communication between the parties in connection with the drilling of the well, and communication between [Schaper] and Robert McKay, an attorney for [Harkins].

3.    [Harkins was] fully aware of North Shore's claim to an oil and gas lease at the time [Harkins] executed the conflicting oil and gas lease to [Dynamic].

4.    More than 30 days passed between the time that [Harkins was] made aware of North Shore's claim and the time that [Harkins] executed the conflicting lease with Dynamic.

5.    [Harkins] did not tender execution of the oil and gas lease as demanded by North Shore within 30 days of North Shore's presentment of its claim.

      . . . .

7.    North Shore's claim was based on a written contract.

46

A trial court's findings of fact are subject to review for legal sufficiency under the same standard applicable to a jury verdict. *See Cont'l Coffee Prods., Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996).

Harkins asserts that North Shore's tender of nearly $33,000 to Harkins in September 2009 was insufficient to "present" North Shore's claim because those payments came before any dispute arose as to the status of the 400.15-acre Hamman Lease tract and "[t]here cannot be presentment of a claim for resolution before the claim ever existed." However, Harkins does not dispute that, as the trial court found, it was aware of the nature of North Shore's claim for at least 30 days prior to time it executed the Dynamic Lease. We conclude that the above findings of fact, including the finding that North Shore's claim was fully presented to Harkins, are supported by sufficient evidence in the trial record.

Finally, Harkins argues that North Shore failed to properly segregate its fees; in particular, it claims that the fee award included amounts attributable to North Shore's claim for reformation of the Option Agreement, which North Shore abandoned prior to trial. In support of his position that section 38.001 does not authorize the recovery of attorney's fees attributable to reformation claims, Harkins cites one memorandum opinion issued by the Fort Worth court of appeals. *See Behrens v. Howard*, No. 02-02-00399-CV, 2003 WL 21404827, at *2 (Tex. App.—Fort Worth June 19, 2003, pet. denied) (mem. op.). The court held, in the context of a claim for reformation of a deed, that "[w]e find no authority authorizing an award of attorney's fees in this type of suit." *Id.* However, the court did not explicitly state that a claim for reformation is not a claim

47

for "an oral or written contract" under section 38.001; instead, the court reversed the attorney's fees award because:

> The suit in this case was not for the purpose of settling a dispute under the contract of sale; the terms of the contract were never disputed, neither party asserted a breach of the contract, and the contract does not impose a continuing obligation on either party to correct any documentary errors related to the closing. [Appellee's] suit arose not from the contract, but from the mistake in incorporating the terms of the contract into the deed.

*Id.*

Harkins directs us to no other authority establishing that a reformation claim is not a claim "for an oral or written contract" under section 38.001, and we find none. Instead, we conclude that North Shore's suit, including its original claims for reformation, were claims for "an oral or written contract" under the statute and therefore the award of attorney's fees was proper. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8). We overrule Harkins's third issue.

## III. CONCLUSION

The judgment of the trial court is affirmed as modified herein. *See* TEX. R. APP. P. 43.2.

DORI CONTRERAS GARZA,
Justice

Delivered and filed the
12th day of December, 2013.